```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
```

Wlodzimierz Szpak,

                         Petitioner,        MC-06-137 (CPS)

  - against -                                AMENDED
                                                  MEMORANDUM OPINION
                                                  AND ORDER

United States Department of Homeland
Security, Andrew Chertoff *as Secretary
of the Department of Homeland Security*,
United States Citizenship and Immigration
Services, and Mary Ann Gantner *as
District Director, New York District,
United States Citizenship and Immigration
Services*,

                        Respondents.
```
----------------------------------------X
```

SIFTON, Senior Judge.

    Petitioner Wlodzimierz Szpak ("Szpak") filed this petition seeking naturalization pursuant to 8 U.S.C. § 1447(b)[1] together with attorney fees and costs for this action under the Equal Access to Justice Act, 28 U.S.C. § 2412. Respondents, the United States Department of Homeland Security, the Department's

---

[1] 8 U.S.C. § 1447(b) provides that "[i]f there is a failure [of the United States Citizenship and Immigration Services] to make a determination ... before the end of the 120-day period after the date on which the examination is conducted ... the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions to the Service to determine the matter."
    It is undisputed that more than 120 days passed from the date of Szpak's examination without a determination by the United States Citizenship and Immigration Services of his application for citizenship.

Secretary, the United States Citizenship and Immigration Services ("USCIS"), and its New York District Director, request that petitioner's naturalization application be denied, or alternatively that it be remanded to the USCIS for denial[2]. A hearing was held before the undersigned on January 23, 2007 to determine whether to grant, deny or remand Petitioner's application to USCIS. For the reasons set forth below, Petitioner's application is granted and the matter is remanded to USCIS to for further proceedings consistent with this decision. Petitioner's application for costs and attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, is denied. What follows sets forth the findings of fact and conclusions of law upon which these decisions are based.

## Background

Petitioner Wlodzimierz Szpak is a fifty-year old native and citizen of Poland. (Pet. for Naturalization Hr'g Tr. ("Tr.") 25-26, Jan. 23, 2007; Szpak Dep. 11, Nov. 15, 2006.) He married Ewa

---

[2] 8 U.S.C. § 1427 (a) provides: "No person ... shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, with the United States for at least five years ... and ... has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, and (3) during all the periods referred to in this subsection has been and still is a person of good moral character ...."

The only dispute here is whether Petitioner possesses the requisite good moral character for United States citizenship.

Filipecka in Poland in 1978. (Tr. 27-28; Szpak Dep. 14.) Petitioner and Ewa's first daughter was born in Poland on March 31, 1979. (Szpak Dep. 15.) Petitioner came to the United States in 1984 without his wife and daughter. (Tr. 30; Szpak Dep. 15.)

In his naturalization application, Petitioner stated that he had been arrested twice in connection with domestic disputes, and once in New Jersey for sitting on a cliff in a dangerous area[3]. (Resp't Pre-Trial Mem. Ex. 2; Petr.'s App. for Naturalization 1, 10-11).

Szpak became a permanent resident of the United States on September 7, 1992. (Szpak Dep. 19.) In 1989, Ewa and Petitioner's older daughter entered the United States. (Szpak Dep. 15.) On January 7, 1993, Petitioner's younger daughter was born. (Szpak Dep. 35.)

Petitioner and Ewa divorced in Poland on August 19, 1997. (Judgment of Divorce Polish Peoples Republic, Aug. 19. 1997).

Petitioner married his current wife, Halina, on October 25, 2001. (Petr.'s App. for Naturalization 6). Petitioner bought his residence in West Hempstead, N.Y. in September, 2002. (Petr.'s App. for Naturalization 5).

---

[3] It is unclear whether Petitioner was arrested or merely received a summons for this act. Petitioner believed he was arrested at the time he committed this act, although, Petitioner no longer believes he was arrested at this time. (Tr. 25.) The Federal Bureau of Investigation ("FBI"), Criminal Justice Information Division did a search based on Petitioner's fingerprints and did not find any records of arrest for Petitioner. The incident in Alpine, New Jersey and the FBI record check are discussed below in more detail.

Petitioner filed an N-400 application for naturalization on January 6, 2004[4] based on 8 U.S.C. § 1427 (a), accompanied by the requisite $310.00 fee and supporting documentation. He was not represented by counsel when he filed the application. (Tr. 37.) USCIS received the N-400 application and assigned it control number EAC001163553.

Petitioner was examined by District Adjudications Officer ("DAO") Finkelstein at the New York District, Garden City Sub-Office on May 11, 2005. Szpak was not represented by counsel at the examination. (Tr. 37.) Upon conclusion of the examination, DAO Finkelstein gave Petitioner a written N-652 form evidencing that Szpak had passed the necessary English, history and government examinations. The form also indicated that a decision on his application had not been made. DAO Finkelstein also gave Petitioner a form N-14, allowing Petitioner 30 days to obtain certificates of disposition of two arrests referred to during the examination, one from August 2, 1993 and the other from January 3, 1996. Petitioner was unable to comply with the N-14 request because neither the New York State Office of Court Administration, Division of Administrative Services[5] nor the

---

[4] In his Petition for Hearing, Szpak identifies February 6, 2004 as the date of application, while respondents state January 6, 2004 as the date of application. The difference need not be resolved since it would not effect the running of the 120 days. 8 U.S.C. § 1447(b). A copy of the application submitted as an exhibit by respondents, has a date stamp of January 6, 2004. (Resp't Pre-Trial Mem. Ex. 2).

[5] The search was based on Petitioner's name and date of birth.

Federal Bureau of Investigation, Criminal Justice Information Division[6] had any records of arrests for Petitioner[7].

DAO Finkelstein, with the approval of two supervisors, thereafter requested further investigation of Petitioner's arrest record to determine if Petitioner had a history of domestic abuse.

Following the examination, Petitioner sent requests to USCIS to determine the status of his naturalization application, which went unanswered. (Pet. For Hr'g ¶ 3.)

Szpak filed his petition with this Court on March 22, 2006, on the ground that Respondents failed to adjudicate his application within 120 days of the date of Petitioner's examination.

Subsequent to the filing of the Petition with this Court, Respondents sent Petitioner a set of Interrogatories and Request for Production of Documents. (Resp't Hr'g Ex. R-1). In his response, Petitioner stated that he was "[n]ever arrested, detained, charged with, (to his knowledge) investigated or convicted of any crime." (Petr.'s Resp. to First Set of

---

[6] The search was based on Petitioner's fingerprints.

[7] Respondents possess a copy of an On Line Booking System Arrest Worksheet stating that Petitioner was arrested on January 30, 1996 for contempt of court and violation of a protection order. Neither the New York State Office of Court Administration, Division of Administrative Services nor the Federal Bureau of Investigation, Criminal Justice Information Division found any record of this arrest. (Resp't Hr'g Ex. X, 7-8 (On Line Booking System Arrest Worksheet, Jan. 30, 1996)).

Interrog. and Req. for Produc. of Docs. of Respt.'s 2; Resp't Hr'g Ex. R-2).

Thereafter, Respondents deposed Petitioner. At the deposition, Petitioner testified, that he had been arrested in New Jersey in 1986 or 1987 for illegally climbing a cliff in a dangerous area. (Szpak Dep. 67-68.) Petitioner also testified that he had been arrested three times in relation to domestic disputes. (Szpak Dep. 73, 75.)

## Discussion

*Jurisdiction*

This Court has jurisdiction over this matter under 8 U.S.C. § 1447 (b), INA § 226 (b).

Before an application for naturalization may be acted upon, the applicant must go through an examination and a personal investigation in the district in which the applicant resides. 8 U.S.C. § 1446 (a). The examination is conducted by an employee of the appropriate immigration service. 8 U.S.C. § 1446 (b), INA § 335 (b). If no determination of an application for naturalization is made within 120 days of the date of the examination, the applicant may apply to a United States District Court for the district in which the applicant resides for a hearing and determination of the appication. 8 U.S.C. § 1447 (b).

Petitioner was examined on May 11, 2005. Thus, a determination should have been made by USCIS no later than September 8, 2005. Petitioner applied to this court on March 22, 2006 for a determination on his naturalization application.

*Prerequisites to Naturalization*

An alien who petitions for naturalization must show that, "(1) immediately preceding the date of filing his application for naturalization [he] has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and ... has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2)[he] has resided continuously within the United States from the date of the application up to the time of admission to citizenship, and (3) during all the periods referred to in this subsection [he] has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." 8 U.S.C. § 1427 (a). Szpak filed the instant application on January 6, 2004. This means that the relevant five year period in question here began on January 6,

1999 and will continue to run until Szpak either takes the oath of allegiance or his application is denied.

A court may, however, consider the applicant's conduct and actions at any time prior to the five year period if two conditions are met. 8 U.S.C. § 1427 (e); 8 C.F.R. § 316.10 (a)(2); *Tieri v. INS*, 457 F.2d 391, 393 (2d Cir. 1972). Under 8 C.F.R. § 316.10 (a)(2) acts and conduct prior to the five year statutory period may be taken into account if they establish the lack of a good moral character and the applicant's conduct during the statutory period does not show that his character is reformed. Second, prior acts and conduct may be taken into account where they are relevant to the applicant's present moral character. *Id*. *See also Rico v. INS*, 262 F. Supp.2d 6, 10 (E.D.N.Y. 2003).

*Acts that Bar Applicant from Establishing Good Moral Character*

Certain conduct bars an applicant from establishing good moral character. *See generally* 8 U.S.C. § 1101 (f). Certain violations of the criminal laws, such as the commission of an aggravated felony, create such a bar. 8 U.S.C. § 1101 (f)(8). *See Chan v. Gantner*, 464 F.3d 289 (2d Cir. 2006). In addition, a person who gives "false testimony for the purpose of obtaining any benefits under this chapter [Chapter 12 - Immigration and Nationality]" is precluded from establishing good moral

character. 8 U.S.C. § 1101 (f)(6); 8 C.F.R. § 316 (b)(1)(vi).

In this Circuit, the test for good moral character is whether "the moral feelings, now generally prevalent in this country [would] be outraged" by the conduct in question, or put another way, whether the conduct in question conforms to "the generally accepted moral conventions current at the time." *United States v. Francioso,* 164 F.2d 163 (2d Cir. 1947). *See also, Johnson v. United States,* 186 F.2d 588 (2d Cir. 1951), *Schmidt v. United States*, 177 F.2d 450 (2d Cir. 1949), and *Repouille v. United States*, 165 F.2d 152 (2d Cir. 1947). Domestic abuse is not morally accepted in this country as evidenced by the numerous statutes declaring domestic abuse illegal. *See, e.g.,* N.Y. Family Court Act § 812 (McKinney 1999) and N.Y. Criminal Procedure Law § 140.10 (4)(b)(ii) (McKinney 2004).

The burden of proving good moral character falls on the applicant, "and any doubts are to be resolved against him". *Kovacs v. United States*, 476 F.2d 843, 845 (2d Cir. 1973) (citing *Berenyi v. District Director*, 385 U.S. 630, 637, 87 S.Ct. 666, 17 L.Ed. 656 (1967)). Whether a person's conduct evidences good moral character is determined on a case by case basis using the generally accepted moral standards of the time. *Rico*, 262 F. Supp.2d at 9.

*Evidence of Szpak's History of Domestic Abuse*

On July 2, 1993 Ewa filed a petition in Family Court of the State of New York in and for Queens County ("Family Court"). In the petition, Ewa stated that on June 27, 1993, Szpak was under the influence of alcohol[8], and was loud and verbally abusive toward Ewa. The petition also states that Szpak pulled a chandelier from the ceiling and broke it[9]. (First Pet. for an Order of Protection 1, Jul. 2, 1993). In addition, the petition states that Szpak kicked Ewa and then grabbed his older daughter and banged her head into a wall[10]. (First Pet. for an Order of Protection 1). Ewa also states in the petition that Szpak kicked her, spat at her, and beat her with a package of diapers for refusing to have sex with him[11]. (First Pet. for an Order of Protection 1).

In response to this petition by Ewa, the Family Court issued a Temporary Order of Protection in effect from July 2, 1993 through August 13, 1993. The temporary order stated that Szpak "shall not assault, menace, harass or recklessly endanger

---

[8] Szpak testified that to him, under the influence of alcohol means he may have had something to drink but was not drunk. (Tr. 76, 78-79.)

[9] Szpak testified that there was no chandelier in his home, but that he may have thrown diapers at a wall and as a result, broke a "wall lighting." (Tr. 76-78.)

[10] The older daughter testified at the hearing on January 23, 2007, and said her father was never violent toward her, her mother or younger sister. (Tr. 17,19-22.) Szpak also testified that he never hurt his daughters. (Tr. 76.)

[11] Szpak testified that he never kicked, spat on or beat his wife with diapers. (Tr. 76.)

Petitioner [Ewa] and children ... and shall remain away from the home while under the influence of alcohol/drugs." (First Temporary Order of Protection, Jul. 2, 1993).

On August 3, 1993, Ewa filed a petition in Family Court alleging that Szpak violated the Temporary Order of Protection. (Violation of First Temporary Order of Protection, Aug. 3, 1993). In the Petition, Ewa states that on August 2, 1993, Szpak entered the house while he was intoxicated and was verbally abusive toward Ewa[12]. The petition also states that Szpak stumbled around the house while holding his younger daughter and Ewa feared that Szpak would fall with or on top of his daughter, and that Szpak pulled at Ewa's clothing, slapped her in the eye, kicked her on the leg and pinched her[13]. Finally, Ewa stated in the petition that she went to the police station and had Szpak arrested.

On August 19, 1993, the Family Court issued an Order of Protection on Consent based upon Ewa's July 2, 1993 petition. (First Order of Protection, Aug. 19, 1993). The order directed that Szpak be excluded from the home while under the influence of drugs and alcohol and not assault, menace, harass or recklessly endanger Ewa or his daughters. The Order of Protection on Consent remained in effect until August 19, 1994.

---

[12] Szpak testified that he wasn't drunk. (Tr. 82.)

[13] Szpak testified that he did not slap, kick or pinch Ewa. (Tr. 79.)

Ewa filed a second petition with the Family Court on May 26, 1995. The second petition states that on May 24, 1995, Szpak came home from work and "had been drinking." The second petition further stated that Szpak choked, punched and kicked Ewa, in addition to pulling a phone from the wall[14].

On the same day, May 26, 1995, the Family Court issued a second Temporary Order of Protection which remained in effect until August 8, 1995. The second temporary order excluded Szpak from his home while under the influence of intoxicants.

A second Order of Protection was issued by the Family Court on August 8, 1995. This Order of Protection does not specify whether it was issued upon consent or whether it was issued following a hearing. The order directs that Szpak not assault, menace, harass, recklessly endanger or act in any disorderly manner and that he stay away from his home while under the influence of alcohol. This order remained in effect until August 8, 1996.

On January 30, 1996, Ewa filed a petition alleging violation of the Order of Protection. This petition states that on January 28, 1996, Szpak was verbally abusive and slapped Ewa while intoxicated, and that as a result Szpak was arrested on January

---

[14] Szpak testified that he didn't pull or rip the phone out of the wall, but that he unplugged the phone from the wall. He further stated that there were at least two additional phones in the house that Ewa could have used at the time. (Tr. 83, 88.)

30, 1996[15].

On April 9, 1996, Family Court issued a third Temporary Order of Protection which excluded Szpak from his house. The third order allowed Szpak to return to his home once, accompanied by a police officer, to retrieve his personal belongings.

Respondents contend that I should deny Szpak's application for naturalization because he has a history of domestic abuse. In support of their position, Respondents state that Szpak's first wife had five orders of protection issued against him between 1993 and 1996[16].

I am not persuaded that there is a history of domestic abuse here, although it is undisputed that there was substantial martial discord which eventually led to a divorce. The first order of protection issued against him was issued on consent. The second order of protection does not state whether it was issued on consent or following a hearing. More significantly, at the hearing, Szpak's older daughter testified that her mother, Ewa, lied to the police when she requested the orders of protection against Szpak. (Tr. 18-19, 21.) Szpak's daughter

---

[15] According to the On Line Booking System Arrest Worksheet of the New York City Police Department, Petitioner was arrested. However, as explained below, both the Federal Bureau of Investigation and the New York State Office of Court Administration searched for records of Petitioner's arrest(s) and neither search found an arrest record. This worksheet is the only record showing Petitioner was ever arrested.

[16] As noted above, only two permanent orders of protection issued against Szpak. The balance were temporary orders arising out of the same incidents that led to the permanent orders.

testified that although Szpak and Ewa argued, Szpak was never violent or abusive toward her or her mother at any time. (Tr. 17, 19.) The testimony of Szpak's daughter is a more persuasive source of evidence than Ewa's incident reports which were filed in the midst of domestic disputes. Szpak's younger daughter now lives with him and his current wife, apparently without objection from Ewa, the source of the complaints of abuse directed allegedly against the younger daughter.

In any event, any history of domestic abuse occurred over ten years ago. As stated above, actions occurring more than five years before an applicant petitions for citizenship can be considered under two circumstance. Neither of those circumstances apply here.

In the first instance, a court may consider events prior to the statutory period if the applicant does not show a reformation of character. That is not the case here. Since his divorce from Ewa, Petitioner has remarried and is living with his daughter and present wife in apparent domestic harmony. For the same reasons, I see no connection between the allegations by Ewa and Szpak's current character.

*Inconsistencies Between Szpak's Deposition and Trial Testimony*

Szpak's actions during the course of his naturalization application are reviewable for the purpose of determining his

good moral character. 8 U.S.C. § 1427 (a). Respondents' contend that Petitioner is barred from citizenship because he has given false testimony under oath in order to obtain it. They contend that he has be inconsistent under oath as to whether he was under the influence of alcohol as Ewa stated in her petitions to family court, the number of times he was arrested and the number of orders of protection that were issued against him.

False statements of this nature, if made for the purpose of becoming naturalized, are enough to establish a lack of moral character. *See Kovacs* 476 F.2d at 845 (an applicant's lack of candor under oath was sufficient reason to deny his petition for naturalization); and *In re Petition of De La Cruz*, 565 F. Supp. 998 (S.D.N.Y. 1983) (an applicant for naturalization denied citizenship because she testified under oath that she did not have an arrest record when, in fact, she did have an arrest record).

I find, however, that Petitioner did not lie under oath. At first, Szpak stated that he had been arrested three or four times. (Szpak Dep. 67-68, 73, 75.) Szpak later denied his arrest record under oath. (Petr.'s Resp. to First Set of Interrog. and Req. for Produc. of Docs. of Respt.'s 2). At the hearing before me, Petitioner offered two explanations as to why he informed USCIS that he had been arrested and then later stated he was not. First, Petitioner stated that he was confused as to

what constituted an arrest. (Tr. 33-34, 68.)  Second, Petitioner explained that once the search results were returned from the FBI and the New York State Office of Court Administration, Division of Administrative Services, to the effect that they could find no arrest records for him, Szpak believed (and was told by his lawyer) that he could say that he was never arrested[17].  (Tr. 42.)

Szpak was not represented by counsel when he filled out his application for citizenship or when he was interviewed at USCIS. (Tr. 37.)  Szpak used his own understanding of what it meant to be arrested when he first filled out his citizenship application. (Tr. 34, 48.)  Once Szpak hired an attorney to help him with the naturalization process, he sent his fingerprints to the Federal Bureau of Investigation ("FBI") in order to check his arrest record.  The FBI did not find any incidents of arrest for Szpak and so informed him.  (Pl.'s Hr'g Ex. 1[18]).  At that juncture, Szpak believed he had no arrest record and answered the government's questions about his arrest record according to the information he received from the FBI.  As opposed to the applicant in *De La Cruz*, 565 F. Supp. 998, who knew she had an

---

[17] Szpak plausibly explained at trial that although he was aware of the FBI search results prior to his deposition, he forgot them.

[18] This exhibit consists of Szpak's fingerprints that were submitted to the FBI and the New York Police Department for a search as to Szpak's arrest disposition.  The set of fingerprints submitted to the FBI has a date stamp on the back that says "no arrest record."

arrest record and said she did not, Szpak answered all questions regarding his arrests based on his knowledge at the time he answered the question.

Szpak also did not lie about the number of Orders of Protection Issued against him. Respondents contended that five Orders of Protection were issued against Szpak. There were two Orders of Protection issued against Szpak, each extending earlier Temporary Orders of Protection. A third Temporary Order of Protection issued against Szpak (but never ripened into an Order of Protection). (Tr. 69-71.) Respondents' also argue that Szpak was inconsistent at his deposition and at trial as to his consumption of alcohol in violation of the Orders of Protection. (Tr. 71-76.) During his testimony before me, Szpak stated that because these events occurred many years ago and he was unable to remember how much he had to drink. In his deposition, Szpak stated that if the court papers said he had something to drink he probably had something to drink. I do not find these statements irreconcilable.

*Costs and the Equal Access to Justice Act*

The Equal Access to Justice Act allows a prevailing party to recover reasonable costs and attorney fees in a civil action brought against any United States agency or any official of the United States acting in his official capacity. 28 U.S.C. § 2412

(a)[19], (b)[20] and (d)[21]. In order to recover attorney fees and "other expenses", a prevailing party must submit an application for fees and expenses within 30 days of a final judgment, accompanied by an allegation that "the position of the United States was not substantially justified." 28 U.S.C. § 2412 (d)(1)(B)[22]. Here, the Respondents' decisions and actions with regard to Petitioner's application were substantially justified.

---

[19] 28 U.S.C. § 2412 (a)(1) states that a judgment for costs "may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action...."

[20] 28 U.S.C. § 2412 (b) states "[u]nless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction or such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms or any statute which specifically provides for such an award."

[21] 28 U.S.C. § 2412 (d)(1)(A) states that "[e]xcept as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and expenses, in addition to any costs awarded pursuant to sub0section (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court find that the position of the United States was substantially justified or that special circumstance make an award unjust."

[22] 28 U.S.C. § 2412 (d)(1)(B) states that "[a] party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed. The party shall also allege that the position of the United States was not substantially justified. Whether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought."

The Supreme Court has defined the term "substantially justified" as "justified in substance or in the main - that is, justified to a degree that could satisfy a reasonable person." *Comm'r of INS v. Jean*, 496 U.S. 154, 158 n. 6, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990) (internal quotation marks omitted). The Second Circuit has held that the government has to show that its position's basis is reasonable "in both law and fact to take the position that it did, at the time that it made its decision." *Sotelo-Aquije v. Slattery,* 62 F.3d 54, 57 (2d Cir. 1995). *See also Pierce v. Underwood,* 487 U.S. 552, 560-61, 108 S.Ct. 2541, 2547-48, 101 L.Ed.2d 490 (1988) (the question "is not what the law now is, but what the government was substantially justified in believing it to have been"). Here, it was reasonable for Respondents to request that Petitioner furnish arrest dispositions and court records regarding domestic disputes because Petitioner mentioned the arrests and the disputes in his naturalization application. (Resp't Pre-Trial Mem. Ex. 2; Petr.'s App. for Naturalization 1, 10-11). In addition, upon the Petitioner being unable to produce the requested arrest dispositions, it was reasonable for the assigned District Adjudications Officer to request further investigation of Petitioner's arrest record to determine if Petitioner had a history and arrest record due to domestic abuse, as arrests for certain actions make an alien ineligible for citizenship. 8

U.S.C. § 1101 (f). The position of the United States Attorneys Office was also substantially justified since the determination of Petitioner's character rested in large part upon credibility determinations best made after trial. Because I determine that Respondents' position was substantially justified, Petitioner is precluded from requesting attorney fees and expenses pursuant to 28 U.S.C. § 2412 (d).

## Conclusion

For the reasons stated above, Petitioner's application for naturalization is granted and the matter is hereby remanded to USCIS for further proceedings consistent with this decision. Petitioner's application for costs and attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, is denied.

The Clerk is directed to enter judgment in favor of Petitioner and to transmit a copy of the within to all parties.

SO ORDERED.

    Dated :    Brooklyn, New York
                July 26, 2007

                      By: /s/ Charles P. Sifton (electronically signed)
                              United States District Judge